# EXHIBIT 2

A. Correct.
Q. Okay. And it indicates that it was hand delivered to you, do you see that notation down at the bottom?
A. Yes.
Q. At -- on --
A. The 20th.
Q. I'm sorry, I've got my own.
MR. MAHONEY: Off the record.
*(Discussion off the record)*
Q. It indicated that this was delivered to you on September 20 at 2:00; is that correct? Down at the bottom.
MR. MAHONEY: The question is is that what it says.
A. It says that.
Q. Do you remember it being -- this hearing notification being delivered to you at about 2:00 on September 20?
A. Yes.
Q. And it indicates on the document that the hearing date is September 21, 2004 at 11:15?
A. Correct.
Q. Do you know why it is that Johnson & Wales schedules hearing -- student code of conduct hearings as quickly as it does?

A. Can you repeat that.

MR. CURCIO: Can you read that back.

*(The question was read by the court reporter, as requested)*

A. To get to the bottom of the situation as quickly as possible.

Q. You were suspended; is that correct? You received notice of suspension?

A. Yes.

Q. And if you miss two or three days of classes, what happens to you?

A. You get dropped from that class.

Q. All right, okay. Did you attend the hearing on September 21, 2004 at 11:15?

A. Yes.

Q. And where did that take place?

A. At the Harborside campus at the Student Code of Conduct Office, second floor of the recreational building.

Q. And do you know who was there from the university?

A. The Student Code of Conduct, the person in charge. I'm not exactly sure of who was there. There was three people there.

Q. There were three people who were there. Okay.

A. Yes.

Q. And did you have an opportunity to explain to these three individuals from, I assume the administration of Johnson & Wales, or the faculty of Johnson & Wales, what happened on September 17 as you've explained it here to us today?
A. Yes.
Q. Okay. Did you ask any of your -- any witnesses to come in and support your story?
A. Yes, Joel and Corey were also present.
Q. Were they present in the room when you --
A. No.
Q. No.
A. We were all called in individually.
Q. Okay. So Joel and Corey both talked to the student conduct -- spoke at the student conduct -- your student conduct hearing?
A. Yes.
Q. Okay. Do you know whether there were any other witnesses that the panel heard from?
A. On my behalf?
Q. From any source.
A. Well, they heard from Don, John. Don Ratcliffe, John Curley and Elyse Okalita. And maybe Anna, I forget her last name. Anna.

Q. And did you on September 22nd, which would have been the day following the hearing, receive a decision from the student conduct review -- strike that. Did you on September 22nd receive the student conduct hearing decision?
A. Yes.
MR. CURCIO: Would you mark that as Exhibit No. 3, please.
*(Defendant's Exhibit 3 marked for identification)*
A. There was a lot that happened between these two times.
Q. Is this a copy of the student conduct hearing decision that you received that's been marked as Exhibit No. 3?
A. Yes.
Q. And it indicates that after carefully considering available information, the hearing panel has found you responsible for the following violations: 1A, 3F. And not responsible for the following violations: 1H. Do you see that?
A. Yes.
Q. Okay. Did you understand what 1A and 3F were?
A. I did, but I don't recall what they were --
Q. Okay.
A. -- right now.

students had chosen not to join the fraternity." Is that statement true?

A. No.

Q. "After a verbal altercation..."

You admit there was a verbal altercation, do you not?

A. Yeah.

Q. Okay. "One student was struck and fell to the ground." Is that statement true?

A. Yes.

Q. Okay. "The student sustained a head injury when he fell to the ground." Is that statement true?

A. I don't know.

Q. Okay. Fair enough. "The victims stated that a knife was shown during the incident."

Now, I know you deny that you had a knife. Do you know whether the victims stated that a knife was shown during the incident?

A. I know they stated that.

Q. Okay. So you know they stated that. And do you know that they stated that the assailant was identified as Christopher Havlik?

A. I know that.

Q. Okay. And do you know that the Providence police were

notified?
A. Yes.
Q. Now, you were charged with assault, is that correct, by the Providence Police Department?
A. Simple assault, yes.
Q. And were you tried in the Sixth Division District Court?
A. Yes.
Q. Were you found guilty?
A. Yes.
Q. Who testified at that trial?
A. Corey Place, Joel Phillips, Elyse Okalita, John Curley and Don Ratcliffe.
Q. Okay. And the judge gave you a suspended sentence or -- strike that. The judge put you on probation for a year?
A. Probation for a year, 25 hours of community service.
Q. And no contact with Mr. Ratcliffe, correct?
A. Correct.
Q. And did you appeal that decision?
A. I appealed that decision, yes.
Q. And you appealed it to the superior court?
A. Correct.
Q. And when was the trial in that case held?
A. I think it started the Thursday the 5th of May.
Q. 2000 and?

BY MR. CURCIO:

Q. I don't think I have much, much more. Did you play any sports at Johnson & Wales?

A. My fraternity was involved in intramurals, so we'd play softball, flag football, basketball, and I would play with them.

Q. How about in high school?

A. High school, yes.

Q. What did you play?

A. Lacrosse.

Q. And where was that?

A. That was at Patchoque Medford High School.

Q. Any other sports?

A. No. Lacrosse, basketball I played. That's about it.

Q. I'm going to mark this big huge document as Exhibit No. 6 -- 7, excuse me.

*(Defendant's Exhibit 7 marked for identification)*

Q. And ask you, Mr. Havlik, if you recognize this?

A. Yes, I do.

Q. Okay. Did you receive a copy of this when you started school in September of 2004?

A. I don't recall. I had to get a copy after they said it's in your student handbook and I didn't know what the

student handbook was, because you get it when you're -- you get it handed to you when you're a freshman when you sign into your dorm.

Q. Yup.

A. But I lived in a house, and anybody who doesn't check into the dorms doesn't get that package that you get. So I had to go get a copy of this after seeing -- after hearing about the Student Code of Conduct -- Student Handbook I mean.

Q. So when you got notice sometime in September of 2004, you went and got a copy of this?

A. I did. After --

Q. All right.

A. -- they referenced it.

Q. Okay. And did you read it?

A. Yeah, I read it.

Q. Okay. And you understood that, you know, there was a Student Code of Conduct?

A. Yes.

Q. Things that were prohibited by the university?

A. Yeah.

Q. You understood that you had a right to a hearing; is that right?

A. Correct.