UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHRISTOPHER HAVLIK

VS. C.A. NO.: 05-510-ML

JOHNSON & WALES UNIVERSITY

**PLAINTIFF, CHRISTOPHER HAVLIKs, MEMORANDUM OF LAW SUBMITTED IN OPPOSITION TO DEFENDANT, JOHNSON & WALES UNIVERSITY's, MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Christopher Havlik, submits this Memorandum of Law in opposition to the defendant's motion for summary judgment. There are material facts in dispute as further delineated in this memorandum.

I. UNDISPUTED FACTS

On the morning of September 16, 2004, Donald Ratcliffe, a student at Johnson & Wales University, realized that his car had been vandalized. Mr. Ratcliffe was upset. (7)[1] He thought a member of the ZBT fraternity was responsible for vandalizing his automobile. (1) The plaintiff, Christopher Havlik was a member of the fraternity. (13)

At night on either September 16, 2004 or in the early morning hours of September 17, 2004, the plaintiff Christopher Havlik was with, among other people, Corey Place. (1) Chris did not drink alcohol. (11)

Mr. Place and Mr. Havlik were approached by Mr. Ratcliffe. Mr. Ratcliffe was angry. He accused the plaintiff of vandalizing his car. (1)

Mr. Ratcliffe was flailing his arms in a menacing manner, close to Mr. Havlik. Mr. Havlik struck Mr. Ratcliffe once in the jaw. (4)

[1]( ) Indicates delineation of paragraph listed in plaintiff's Statement of Undisputed Facts.

The Chief Counsel for Johnson & Wales University, Barbara Bennett, received a draft "Crime Alert". (22) (23) She made two changes to this draft "Crime Alert". (24) She inserted the fact that ZBT fraternity members were involved in the incident and she identified Christopher Havlik by name. (24) This information was not contained in the original draft.

Prior to this time, the University had problems with ZBT members. (25) There was no identification of Christopher Havlik as having been involved in any previous fraternity impropriety. (25)

The hearing involving Christopher Havlik was conducted on September 21, 2004. On that day Mr. Havlik was found not responsible for possessing a knife but was found responsible for violating school regulations regarding use of physical force endangering the health or safety of another person and conduct that would violate Federal, State or local laws. (29) Christopher Havlik filed an appeal from this decision and his appeal was heard and denied on September 29, 2004. (31)

The "Crime Alert" regarding the plaintiff was published after the original hearing involving Mr. Havlik but eight (8) days before his appeal was denied. (16) The "Crime Alert" was distributed throughout the campus, including all three floors of the Arcade. (33)

Mr. Martel, the Dean of Students, at the time of the incident spoke to Chris Havlik and his mother after the hearing but before Mr. Havlik's appeal was heard and denied. (14) Dean Martel referred to members of Chris' fraternity as "thugs" and accused Chris of lying. (14) Dean Martel spoke to the appellate officer, Vice President of the Providence campus, Ms. Veera Sarawgi, before Ms. Sarawgi denied Mr. Havlik's appeal. (19) He spoke to Ms. Veera about the specifics of the case and the reason why this individual should be dismissed from the university. (19) Mr. Havlik was dismissed from the university as his appeal was denied. (18)

Donald Ratcliffe was a hockey player. (5) At the time of the incident Mr. Ratcliffe was nineteen (19) years old. (6) On the night of the incident he was intoxicated. Mr. Ratcliffe's blood alcohol was .242. (9) (10) He was angry that his car had been vandalized. (3) He accused Mr. Havlik of vandalizing the car. (1)

Under age drinking was a violation of student conduct rules at Johnson & Wales University as of September, 2004. As far as Dean Martel knew, nothing was done by the University to look into whether Mr. Ratcliffe was drinking at the time of the incident. (12)

The "Crime Alerts" had been published concerning other students who had been accused of committing a crime, but none of those students' names had been mentioned in the "Crime Alert" published regarding them. (20)

The defendant's "Exhibit 5", the Johnson & Wales University security report, indicates that respondent Security Officer Rebecca Steele investigated the incident. She spoke to two (2) Johnson & Wales University hockey coaches, Eric Noack and Jamie Marcoux. She also spoke with Athletic Director John Parente. Mr. Ratcliffe was a member of the Johnson & Wales Hockey Team. (5)

## II. ISSUES RAISED BY DEFENDANT IN ITS MOTION FOR SUMMARY JUDGMENT

1. Did the "Crime Alert" published and distributed by the defendant contain false statements of fact?

2. If the "Crime Alert" did contain false statements of fact, did the defendant have a qualified privilege to publish and distribute the document?

3. If the "Crime Alert" did contain false statements of fact and there was a qualified privilege attached, is there an issue of fact with regard to whether the defendant University acted with ill-will or spite at the time of the publication of the "Crime Alert"?

4. Is there sufficient evidence for a jury to consider punitive damages in this case?

5. Has the defendant University breached its contract with the plaintiff?

III. ARGUMENT

1. Did the "Crime Alert" published and distributed by the defendant contain false statements of fact?

In determining whether or not a statement conveys a defamatory meaning, courts will interpret the language in its ordinary sense. McCann v. Shell Oil Company, 551 A.2d 696, 698 (RI 1989). Spoken and written words are presumed to be used in their ordinary import in the community in which they are uttered or published. The decisive question is what the person to whom the communication was published reasonably understood as the meaning intended to be expressed. Lyons v. Public Employees Council, 516 A.2d 1339, 1343 (RI 1986).

The defendant suggests that the "Crime Alert" content was true. In the context of the above cited law, the defendant suggests that the reasonable import of the "Crime Alert" was an accurate reflection of what occurred by and through the undisputed facts in the early morning hours of September 17, 2004.

The defendant in making this argument overlooks the bold print on top of the defamatory document which reads, "CRIME ALERT ASSAULT". Toward the bottom of the document, the sentence reads, "The assailant was identified as Christopher Havlik.". Websters II, New Riverside University Dictionary, 1984 defines the word "assailant" as "one who assails another". The same dictionary defines the word "assail" as "to attack with or as if with violent blows".

The import of the publication is that a crime occurred. The crime was that of assault. The assailant, or the one who perpetrated the crime, was Christopher Havlik.

The "Crime Alert" is also inaccurate and defamatory in that the publication inaccurately supplies motive why Mr. Havlik may have assaulted his alleged victim. Christopher Havlik, a ZBT member, was not angry with Mr. Ratcliffe because Mr. Ratcliffe did not choose to join the fraternity. Mr. Havlik's undisputed testimony, to date, is that it was Mr. Ratcliffe who was angry with Mr. Havlik because Mr. Ratcliffe's car had been vandalized and Mr. Ratcliffe was accusing Mr. Havlik of being the vandal.

The "Crime Alert" is also inaccurate because the document makes reference to the fact that a knife was used during the incident. The Hearing Board members found that Mr. Havlik was not responsible for using a knife before the "Crime Alert" was published.

The "Crime Alert" referenced the fact that there were "victims". The only alleged victim was Mr. Ratcliffe. The "Crime Alert" suggests that the "victims" stated that a knife was shown during the incident. There is no evidence that Mr. Ratcliffe ever accused Mr. Havlik of possessing a knife.

The defendant contends that the "Crime Alert's" reference to a knife being used during the incident is true. The defendant draws this conclusion from the fact that the Providence Police report references that Ms. Okolita reported to the police that she saw a knife during the altercation. The repeater of a libelous statement cannot defend the claim by proving that the source named did, in fact, utter the statement. A person who republishes libelous or slanderous material is subject to liability in the same manner as if he or she had published it originally. Martin v. Wilson Publishing Company, 497 A.2d 322, 327 (RI 1985).

2. If the "Crime Alert" did contain false statements of fact, did the defendant have a qualified privilege to publish and distribute the document?

At the time of the events in issue, the publication of the "Crime Alert" was the direct responsibility of Johnson & Wales University's Chief Counsel, Attorney Barbara Bennett. In fact, Ms. Bennett made two (2) critical changes to the original draft of the "Crime Alert". First, she felt it necessary to include the fact that ZBT members were involved in this incident and she also changed the draft "Crime Alert" by identifying Christopher Havlik as the "assailant".

The defendant suggests that the Clery Act and the Code of Federal Regulations issued by the Offices of the Department of Education, 34 C.F.R. § 668.46 required the defendant to publish the "Crime Alert" in issue. The Clery Act did not require publication of a "Crime Alert" in this instance. 34 C.F.R. § 668.46(e) indicates that:

> An institution must, in a manner that is timely and will aide in the prevention of similar crimes, report to the campus community on crimes that are – (i) described in paragraph (c)(1) and (3) of this section.

The crime related in (c)(3) relates to hate crimes that are obviously unrelated to this case. The crimes specified in subsection (c)(1) are as follows: criminal homicide, murder and non-negligent manslaughter, negligent manslaughter, sex offenses, forcible sex offenses, non-forcible sex offenses, robbery, aggravated assault, burglary, motor vehicle theft, arson and arrest for liquor law violations, drug law violations and illegal weapons possession.

In this particular case, the defendant's own action suggests that the incident in issue involved an alleged assault. The very "Crime Alert" that the defendant published referenced the incident as having been one of assault. The plaintiff was charged criminally, although ultimately acquitted of an assault. The defendant would suggest that it was compelled by Federal law to report an alleged assault. This Federal statute does not call for such reporting.

The aforesaid Federal regulation mandates some type of notice with regard to the aforesaid crimes, not including assault, if those crimes occur on campus, in or on non-campus

buildings or property and on public property. § 688.46(11)(c)(1). Public property is defined in § 668.46(a)(2) as:

> All public property, including thoroughfares, streets, sidewalks and parking facilities that is within the campus, or immediately adjacent to and accessible from the campus.

The Providence Police Department record, referenced by the defendant, identifies the incident as having occurred on a highway/road/alley at 25 Richmond Street. The police report also references the incident as a simple assault.

Did this incident occur immediately adjacent to Johnson & Wales University property? It is unclear where the incident occurred. The police report references 25 Richmond Street. The "Crime Alert" describes the incident as having occurred on Pine Street. Is the location of the crime immediately adjacent to the Johnson & Wales campus and accessible from it? It is impossible to answer that question based on the facts of this case.

Attorney Bennett testified that she considered three (3) factors when deciding to issue a "Crime Alert". 1.) Was the crime one that was covered by the Federal regulation? 2.) Had it been reported to campus security or local police? and 3.) Is the student perceived to be a threat to other students or employees? If in fact Johnson & Wales University's Chief Counsel had looked at the Federal statute and regulation, she would have known that there was no requirement to provide a timely warning in this particular case because the alleged crime was one of assault.

The Federal statute does take into consideration precisely where the crime occurred for purposes of warning requirements. Chief Counsel Bennett simply thought that a crime within the vicinity of the campus was sufficient to compel publication of the "Crime Alert". This is not the case. The Federal statute is very specific concerning the nature of the crime and the location

of the crime with regard to corresponding warning requirements imposed upon a University

A person may escape liability for a false and defamatory statement made about another if the occasion for the publication is such that the publisher acting in good faith correctly or reasonably believes that he has a legal duty to speak to protect either his own interest or those of third persons, or certain interests of the public. Pontacelli v. Mine Safety Appliance Co., 104 RI 459, 551, 247 A.2d 303, 305 (1968). The defendant contends that it had a qualified privilege to publish the "Crime Alert" because Federal law "required" it to do so. Pontacelli, supra makes abundantly clear that a publisher must act in good faith by correctly or reasonably believing that the Federal law applies in this case. It is obvious that the defendant incorrectly assumed that the Federal law applied to these facts. Did the defendant act reasonably?

The defendant, by its own acknowledgement, published a "Crime Alert" concerning an assault. An assault is not a crime covered by the Federal statute. The defendant relied upon the content of the Providence Police report which it attaches to its memorandum. The Providence Police report referenced a simple assault. The plaintiff was charged by the State with simple assault.

The "Crime Alert" and the Providence Police record indicate that this incident occurred in two (2) different locations. It is incumbent upon the defendant to know where the crime occurred for purposes of discerning whether the Federal statute is applicable. How can one argue that the defendant acted reasonably when it had no basis for knowing where the alleged crime occurred?

Since the alleged crime involved a simple assault and since the location of the alleged crime was unknown, the defendant cannot be heard to argue that the Federal statute applies. Parenthetically, this would seem to be even more compelling since in this particular case, the

school knew that the people involved in this incident were all Johnson & Wales students. The school knew that all of those students had certain rights as students in the school and that if, under any circumstances, it may have risen to a simple assault involving one student and another, the defendant should have not only read the Federal statute in a thorough manner, but given at least some consideration to Mr. Havlik's rights as a Johnson & Wales student.

3. If the "Crime Alert" did contain false statements of fact and there was a qualified privilege attached, is there an issue of fact with regard to whether the defendant University acted with ill-will or spite at the time of the publication of the "Crime Alert"?

If a qualified privilege applies in this case, there is a factual issue with reference to whether the defendant published the "Crime Alert" with ill-will or spite directed at the plaintiff. A qualified privilege is lost when a plaintiff can show that the primary motivating force of the communication was the publisher's ill-will or spite toward the plaintiff. The question of whether a communication is qualifiedly privileged will turn on the particular fact situation of each case. Pontacelli, supra, 104 RI 549, 554, 555 and 556.

Is there evidence for a jury to consider, if the qualified privilege attaches to the facts of this case, that the defendant acted with ill-will or spite toward the plaintiff? Before Mr. Havlik's appeal was rejected on September 29, 2004, the Dean of Students called him a liar. The Dean of Students called Mr. Havlik's fraternity members "thugs".

Dean Martel and Chief Counsel Bennett were aware that Mr. Havlik's fraternity had had prior disciplinary problems. Notwithstanding this fact, both the Dean and Chief Counsel, acknowledged that they had no information that Mr. Havlik had ever been previously involved in any incident.

The plaintiff is approximately 5'9" tall and the alleged victim is 6'4" tall. The plaintiff was sober and the alleged victim was intoxicated. There was no evidence that the plaintiff had a motive for violence and the alleged victim was angry about the fact that his car had been vandalized. Mr. Ratcliffe mistakeningly thought that the plaintiff had vandalized his car.

The plaintiff was charged with a violation of student code sections and the alleged victim, Mr. Ratcliffe, was not. The day after the incident the security report relied upon by the defendant reveals that Mr. Ratcliffe had the support of the Athletic Director and two hockey coaches. Mr. Ratcliffe was a hockey player. Mr. Havlik was not.

Previous "Crime Alerts" involving students who had allegedly committed a crime did not reveal the student's name according to the Dean of Students Martel. In this case, the draft "Crime Alert" that Attorney Bennett reviewed did not contain Mr. Havlik's name. Attorney Bennett thought it appropriate to include Mr. Havlik's name in the "Crime Alert" and to include in the "Crime Alert" reference to ZBT members.

This record is replete with sufficient facts for a jury to consider, even if one stretched the facts and law to apply the Federal statute, concerning whether the defendant acted with ill-will or spite toward this plaintiff. The University was upset with Mr. Havlik's fraternity. The University wanted to protect its athlete. The University took no action against the athlete. The University had previously not revealed the identity of students who were allegedly involved in crime, yet in this particular case, notwithstanding the inapplicability of the statute on its face, the University chose to identify Mr. Havlik.

4. Is there sufficient evidence for a jury to consider punitive damages in this case?

There are sufficient facts for a jury to consider whether to award the plaintiff punitive damages.

The Rhode Island Supreme Court has adopted the actual malice standard set forth in New York Times v. Sullivan for an award of punitive damages in a defamation action. Healey v. New England Newspapers, Inc., 555 A.2d 321 (RI 1989). Consequently, the plaintiff must prove that the defendant knew or should have known that the publication was false in order for a jury to consider whether the plaintiff is entitled to punitive damages.

The undisputed facts suggest that the "Crime Alert" publication was prepared and distributed after a University panel found Mr. Havlik not responsible of possessing a knife at the time of the incident involving Mr. Ratcliffe. Notwithstanding this fact, the "Crime Alert" references a knife.

The defendant argues that Attorney Bennett did not know that a panel had previously absolved Mr. Havlik of any involvement with a knife at the time that the "Crime Alert" was published. The defendant argues that the finding of the hearing panel and the publication of the "Crime Alert" involved two (2) " . . . unrelated and separate units, each carrying out its respective responsibilities".

Defendant's argument misses the point. Both the disciplinary panel and the Department of Security were involved Johnson & Wales University personnel. It is legally irrelevant that Attorney Bennett knew that the panel had cleared Mr. Havlik of possession of a knife. The University knew that Mr. Havlik did not have a knife at the time that the same University published the "Crime Alert".

If the evidence demonstrates that the defendant participated in, or authorized or ratified the actions of its agent, punitive damages can be assessed against the publisher. AAA Pool Service and Supply, Inc. v. Aetna Casualty & Surety Co., 479 A.2d 112, 114, 115 (RI 1984). The defendant's agents actually perpetrated the conduct which constitutes the action for which

punitive damages is sought. This is not a case where the plaintiff has to prove that the defendant ratified anything. It was the University's conduct through its Disciplinary Board and its Chief Counsel that gives rise to the factual conclusion that the defendant University published the "Crime Alert" with knowledge of its falsity as it relates to the knife.

5. Has the defendant University breached its contract with the plaintiff?

The defendant breached its contract with the plaintiff.

The student – college relationship is essentially contractual in nature. The terms of the contract may include statements provided in student manuals and registration materials. The proper standard for interpreting the contractual terms is that of reasonable expectation – what meaning the party making the manifestation, the University, should reasonably expect the other party to give it. Under Rhode Island law, contracts contain an implied duty of good faith and fair dealing. Mangla v. Brown University, 135 F.3rd 80 (1998).

The defendant's Statement of Undisputed Facts #27 references the Student Handbook. Pursuant to the handbook, Johnson & Wales University provided it's student, Christopher Havlik, with a right of appeal. The right of appeal relates to, among other things, a review as to whether the sanction (expulsion) was inconsistent with the violation or circumstances of the incident.

Unquestionably, the Student Conduct Handbook constitutes part of the contract that existed between Johnson & Wales University and the plaintiff. The plaintiff filed an appeal. During the pendency of the appeal two things happened. First, the "Crime Alert" was published and distributed all over the campus and University related buildings. Second, the Dean of Students told the appellate hearing officer all about the case and advised her that he saw no reason why Mr. Havlik's expulsion was not justified. The Dean of Students had this

conversation with the hearing officer after he had called Mr. Havlik a liar and his fellow fraternity members "thugs".

Mangla, supra applies the reasonable expectancy standard as it relates to a case like this one. What meaning should the University reasonably expect plaintiff, Mr. Havlik, to give his right to an appeal of an adverse decision by a hearing panel? Did Johnson & Wales University act in good faith and fair dealing prior to making a decision with regard to Mr. Havlik's appeal? These are the questions that Mangla, supra requires the court to consider.

Johnson & Wales University should have known that Mr. Havlik, or any other student for that matter, would expect that during the pendency of his appeal that the University walls would not be plastered with a "Crime Alert" accusing this student of a crime. The defendant should reasonably assume that Mr. Havlik's expectation would be that before his appeal was decided, the appellate officer who held Mr. Havlik's academic fate in her hands, would not be influenced through a conversation with the Dean of Students who had already prejudged Mr. Havlik as a liar, and by association, a "thug".

The appellate officer upheld the decision of the board members and affirmed Mr. Havlik's expulsion from Johnson & Wales University. Was this appellate officer's decision truly independent or was it impacted in some form by the prejudgment of the "Crime Alert" and the prejudice of the Dean of Students? This is a factual question for a jury.

The defendant, Johnson & Wales University, did not act in good faith. The University did not comply with the reasonable expectation that Mr. Havlik would have had as a student with regard to his contractually provided conduct review process rights. The University prejudged Mr. Havlik and interfered with the appellate officer's responsibility to review the case and make her own decision.

## IV. CONCLUSION

The "Crime Alert" published concerning this plaintiff was libelous. The defendant did not have a qualified privilege to publish the "Crime Alert" because the "Crime Alert" clearly related to an assault allegation and the Clery Act publication requirements do not pertain to assault. The Clery Act geographical specification requires that the crimes referenced have occurred in a public area that is immediately adjacent to and accessible to University property. That is not the case in this instance.

If, notwithstanding the above, it is deemed that a qualified privilege is applicable, there is more than sufficient factual evidence for a jury to consider ill-will and spite on the part of the University. The University published the "Crime Alert" by inserting the plaintiff's name after the draft did not contain his name. The "Crime Alert" contained reference to ZBT fraternity members after the draft "Crime Alert" did not.

The Dean of Students thought that ZBT members were "thugs". The Dean of Students thought that Mr. Havlik was lying. The Dean of Students spoke to the appellate officer before she made her final decision upholding Mr. Havlik's expulsion from the University.

Prior "Crime Alerts" involving students accused of crime did not reference their identity. Mr. Havlik was charged with violating regulations pertaining to student conduct. Mr. Ratcliffe was born on April 17, 1985. He was nineteen (19) years old at the time of this incident. He had a blood alcohol of .242. Mr. Havlik was not charged with a violation of a regulation that prohibits under aged drinking.

Mr. Ratcliffe was a hockey player. Immediately after this incident the Athletic Director and two (2) hockey coaches came to his defense when speaking to a security officer. Mr. Havlik was not an athlete. No-one came to his defense.

The publication regarding Mr. Havlik contained an allegation that a knife was involved in the incident. Previous to the publication the University had determined that a knife was not involved in the incident. The publication was prepared and distributed with knowledge of falsity of the allegation of the knife possession.

The University breached its contract with the plaintiff. The University knew that Mr. Havlik had a reasonable expectation that his appeal would be dealt with in a fair and reasonable manner by University personnel. It was not fair and reasonable to proclaim Mr. Havlik's guilt by publishing the "Crime Alert" and letting the "Crime Alert" sit in various campus buildings for eight (8) days prior to his appeal having been decided. It is not fair and reasonable that the Dean of Students, who has already determined that the plaintiff is a liar and that his fraternity brothers are "thugs", to advise the appellate officer to uphold the expulsion before this hearing officer made that decision based on her own independent judgment.

For all the reasons indicated, the plaintiff respectfully requests that this case proceed to a jury trial so that the plaintiff finally has the opportunity to vindicate himself.

CHRISTOPHER HAVLIK,
BY HIS ATTORNEY,

/s/ JOHN R. MAHONEY, ESQ.

JOHN R. MAHONEY, ESQ. - #1940
ASQUITH & MAHONEY, LLP
155 SOUTH MAIN STREET, 2nd FLOOR
PROVIDENCE, RI 02903
(401) 331-5353 – Telephone
(401) 331-7373 – Fax

CERTIFICATION

I hereby certify that on the 9th day of December, 2006 I electronically filed the within to Paul V. Curcio, Esq., Adler, Pollock & Sheehan, PC., One Citizens Plaza, 8th Floor, Providence, RI 09203 – 1345.

/s/ JOHN R. MAHONEY, ESQ.
JOHN R. MAHONEY, ESQ. - #1940
ASQUITH & MAHONEY, LLP
155 SOUTH MAIN STREET, 2nd FLOOR
PROVIDENCE, RI 02903
(401) 331-5353 – Telephone
(401) 331-7373 – Fax