UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHRISTOHER HAVLIK

VS C.A.NO. 05-510-ML

JOHNSON & WALES UNIVERSITY

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION of RONALD L. MARTEL, Vice President of Student Affairs, Johnson & Wales University, taken in the above-entitled cause on behalf of the Plaintiff, pursuant to notice, before Patricia M Aloisio, Notary Public in and for the State of Rhode Island, at the offices of Asquith & Mahoney, 155 South Main Street, Providence, Rhode Island on August 21, 2006 at 3 P.M.

APPEARANCES:

FOR THE PLAINTIFF:
ASQUITH & MAHONEY
BY: JOHN R. MAHONEY, ESQ.

FOR THE DEFENDANT:
ADLER, POLLOCK & SHEEHAN, PC
BY: PAUL V CURCIO, ESQ.

the behavior, that indeed it was a very serious situation, and that discipline, a suspension and/or dismissal would obviously be the sanction appropriate for what transpired. At that point in time, he was obviously dismissed given the sanction that was administered and had an opportunity to appeal the decision and he was told that.

Q And so do you recall telling Chris and his mother as of the date you talked to them after the hearing that he had a right to an appeal?

A Yes.

Q The letter indicates in the last paragraph on the first page that it was apparent that you had made up your mind before the meeting and that you had accused Chris of lying and used the term of 'thugs' to describe his fraternity.

Did you say those things at the meeting?

A Yes, I did.

Q And did you have a problem with -- and when I say you I'm talking obviously you in your professional role -- a problem with a fraternity or fraternities at Johnson & Wales University as of September 21, 2004?

A There was a history prior to my arrival of problems

with fraternities and several had their charters revoked.

Q And is that obviously information that was given to you by someone else?

A Yes.

Q And do you recall who that person or people were?

A Student Activities Office.

Q How many fraternities were associated with Johnson & Wales as of September 2004?

A I don't remember the exact number.

Q And you didn't have any information that Chris Havlik had been a discipline problem as of September 16, 2004. Is that fair to say?

A I did not.

Q Apparently he was a member of ZBT, whatever that means, but had there been to your knowledge a problem with that fraternity at all as of September 16, 2004?

A Yes.

Q And do you know what the nature of the problem was?

A It was basic rowdiness, noise levels, some threatening behavior relative to pledges and felt as though they were being harassed for de-pledging.

Q Now, since you had only been there about three weeks, I take it that the answer you just gave me was again

obtained from Security as to whether he was drinking or not?
A Correct.
Q And what else did you do, if anything?
A Beyond that nothing.
Q And at the time that you spoke to Christopher Havlik and his mother you had already talked to Security; had you not?
A I believe so, yes.
Q So that following that conversation as far as you know nothing was done by the University to look into whether Radcliffe was drinking?
A To my knowledge, no.
Q And let me ask you this, not so much from disciplining -- well, strike that.
Q Was public intoxication a violation of any student conduct rules at Johnson & Wales as of September 2004?
A No.
Q So that was the issue of whether Radcliffe was intoxicated or not -- well, strike that.
Q Was underage drinking a violation of student conduct rules at Johnson & Wales as of September 2004?
A Correct.

Q Fair to say?
A Yes.
Q So would you, therefore, agree with me that this Crime Alert would have been distributed and published at least prior to any appeal he took?
A Correct.
Q And were you familiar with the distribution of documents, not necessarily in this case, but Crime Alert documents before September 21st, 2004?
A No, I was not.
Q And where did you see this Crime Alert Exhibit 8?
A This was posted, when I first saw it posted on the second floor of the Recreation Center.
Q And when you saw it on the second floor of the Recreation Center where was it? I know it was on the second floor, where was it?
A It's in a glass enclosed case.
Q I see. And when you saw it, had you seen at Temple or at Northeastern or at any other university you had either been employed by or attended a document similar to this?
MR. CURCIO: Objection.
MR. MAHONEY: And by that I simply mean a document which was describing a

A A Crime Alert, yes.
Q What did you talk to her about?
MR. CURCIO: Don't answer the question.
Q Why did you approach her?
A Basically because I had never seen as I said earlier Crime Alerts posted publicly.
Q And so what did you want to obtain regardless of what she told you, what is it that you wanted to obtain from her, what information, if any?
A What the process was for specific Crime Alerts, what determined whether a Crime Alert was posted or not, was this a federal mandated requirement.
Q So did you have any concerns about the issuance of Crime Alerts when you approached her?
A Basically just information I wanted to know why they were being posted.
Q I understand that and what was it that peeked your curiosity about the publishing of Crime Alerts that resulted in your going to her?
A Because I thought they were basically confidential.
Q And when you say 'they', you're referring to Crime Alerts?
A Crime Alerts in general, yes.
Q When you read the Crime Alert Exhibit 8 on the second

floor of what was it the Recreation Center?
A Correct.
Q Were you concerned in your role is the Dean of Students about the fact that the Crime Alert was being published on September 21, 2004 before an appeal, if any, was filed by Havlik?
MR. CURCIO: Objection.
A No.
Q Well, who did you consider to be the publisher of the Crime Alert?
A At that point I didn't know.
Q But do you see at the top where it reads, Johnson & Wales University?
A Correct.
Q Now have you since found out, regardless of what department it was, that in fact it was Johnson & Wales University who published the Crime Alert?
A Well, I knew that.
Q You knew that?
A Yeah. Specifically in the University I did not know who authorized this.
Q I see. But you knew it was the University?
A Oh yes.
Q And who was hearing the appeal, if any, that Havlik

filed?
A Veera Sarawgi.
Q And is that a woman?
A Yes.
Q And who is she?
A She was the Vice President of the Providence Campus.
Q But that would be Johnson & Wales University?
A Correct.
Q So just to make sure I understand, did you come to find out that Havlik did appeal the decision that was rendered against him on or about September 21, 2004?
A I don't recall the exact date. It must have been around there though.
Q But my question simply is did you find out regardless of what date it was that Havlik filed an appeal?
A Yes, I did.
Q And how did you come upon that information?
A Ms. Sarawgi contacted me indicated that an appeal had come across her desk requesting that the folder be forwarded to her.
Q And looking at Exhibit 6.
A Okay.
Q Did you ever see that document before?
A Yes, I did.

Q And what is that document?
A That is really the Appeal Review Notice which indicates whether or not a decision is upheld, overturned.
Q Amd what is the date on that document?
A 9/29.
Q Any reason to doubt the accuracy of the date?
A No.
Q So that it would appear to you from looking at Exhibit 6 that the appellate officer whose name is Veera what?
A Sarawgi.
Q Sarawgi, she upheld or affirmed the decision of the Conduct Review Hearing Board on September 29, 2004; is that correct?
A Yes, it is.
Q And she was employed and acting in her official capacity as an appeal officer for Johnson & Wales University?
A That's correct.
Q Paid by them as far as you know?
A Yes.
Q Not so much for that appeal per se, but in general?
A Yes.

time, I forwarded that to the appellant officer; so, yes, it did constitute his formal request for appeal, but not to me.

MR. MAHONEY: Fair enough.

Q So I think what you're telling me is that Exhibit 9 did in fact constitute Havlik's appeal, but in fact he sent it to you and you were not the correct person to send it to so you in turn made sure that the appellant officer received it?

A Correct.

Q And was that appellate officer Veera?

A Yes.

Q So did you hand deliver it to her or did you provide it to her by some other means?

A I sent it interoffice, I believe.

Q Did you ever speak to her before the decision was rendered by her on September 29, 2004?

A Yes, I did.

Q And what did you talk to her about?

A She wanted specifics of the case, what transpired which I indicated to her in the folder, the Incident Reports were pretty clear, the decision of the panel was pretty straight forward, and did she see any reason why this individual should not be dismissed

from the University; and I indicated no, I did not.
Q So you're saying that she did speak to you in addition to -- well, strike that.
Q What documentation would she have received, if you know?
A She would have gotten the folder which included the Incident Report, the Hearing Notification, the hearing procedure, and the final decision by the hearing officers.
Q Was there a transcript of testimony before the three-board panel?
A No, there is not.
Q So what information other than the Incident Report and the bare bones decision of the panel finding him responsible for a violation of two student codes and not responsible for one code would the hearing officer have?
A Well, if they are any other witness statements or any other information that was forwarded or sent in either before or after the hearing.
Q And was there any information in this case?
A I don't recall. I have not looked at the folder.
Q How many Crime Alerts have you actually read that have been published by Johnson & Wales in the

approximate two years you've now been with the University?
A About half dozen.
Q Would you assume that you have read most if not all of them that have been published or is there a reason why you may have missed some?
A There can be a number of reasons. They're not sent to me directly and posted so I may have picked some up and some I haven't.
Q And of those approximate six that you've looked at, have they all involved Johnson & Wales students?
A Yes.
Q And of those 6, and I understand that's an approximation, one of which is obviously Havlik, have any of the others identified individuals by name?
A No.
Q And do you know why that is so?
A I assume federal reporting. Privacy.
Q Well, no. What I'm asking you though is if I understand you and I do recognize you approximated you're just estimating that over two years you've seen about 6 Crime Alerts; correct?
A Correct.
Q One of them would clearly be Havlik?

A Correct.
Q If your number is accurate, the other 5 to the best of your recollection related to students?
A Correct.
Q And would these all have been situations in which students were involved in some type of improper conduct?
A Correct.
Q Would those other 5 by way of estimation relate to crimes?
A Correct.
Q And in those other instances you've never seen the name of an individual student on the Crime Alert?
A That is correct.
Q And what distinction, if any, have you drawn independently of anybody or any other document as to why one specified Havlik and the other 5 involving students didn't indicate who the student was?
MR. CURCIO: Objection.
A A good question, I don't know.
Q Have you ever talked to anybody about the answer to that question why the Crime Alert which is Exhibit 8 or 13 in this case concerning Havlik mentioned Havlik but the other approximate 5 don't mention the

University student?
A Yes.
Q To your knowledge you haven't seen one yet that involved some type of alleged crime wherein a University student is not involved?
A I mean some are generic enough which probably could be interpreted as not part of our student based population, but traditionally it's usually involved a student in some way, shape, or fashion; but, yeah, over the majority of times that I've seen Crime Alerts they have involved our students.
Q And I'm not going to ask, I understand there are privacy rights, I'm not going to ask who the people are the students; but were any of those students as it relates to those other Crime Alerts ultimately expelled from the school for whatever the particular alleged infraction was?
A Some have.
Q Some have?
A Yes.
Q So fair for me to conclude in situations involving other students -- and we will get no more specific than that -- that the Crime Alert that was published regarding them did not identify them, but the offense

was ultimately deemed serious enough by the University that they were expelled?
A Correct.
MR. CURCIO: Objection.
Q And would you say that that has occurred, again, as it relates to other Crime Alerts you've seen -- in more than one instance?
MR. CURCIO: Objection.
A Yes.
Q The approximate number is 5 and, again, just so it will be clear on the record that I'm not deliberating misstating what you have said, it could can 3 I take it, it could be 6 or 7 other Crime Alerts. That's an estimate; correct?
A Correct.
Q How many would you say have related to students who were ultimately dismissed by the University?
MR. CURCIO: Objection.
A I couldn't quantify that. I just know that there are others that have.
Q Have you ever, and if you've addressed this, I'm almost done, if you've addressed this, I just don't remember.
Have you in the two years you've been at the