UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHRISTOPHER HAVLIK

VS C.A. NO. 05-510ML

JOHNSON & WALES UNIVERSITY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

D-E-P-O-S-I-T-I-O-N

DEPOSITION of Barbara L. Bennett, Esq., taken in the above-entitled cause on behalf of the Plaintiff, pursuant to notice, before Brenda A. Scharver, Notary Public in and for the State of Rhode Island, at the offices of Asquith & Mahoney, 155 South Main Street, Providence, Rhode Island on September 27, 2006 scheduled for 10:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF:
ASQUITH & MAHONEY
BY: JOHN R. MAHONEY, ESQ.

FOR THE DEFENDANT:
ADLER, POLLOCK & SHEEHAN
PAUL TARANTINO, ESQ.

ORIGINAL

Q You are employed by Johnson & Wales University?
A Yes.
Q In what capacity?
A General counsel and corporate secretary.
Q When did you become an attorney?
A 1981.
Q What is your date of birth?
A May 18, 1953.
Q Where did you go to law school?
A New York University School of Law.
Q You graduated in 1981?
A Yes.
Q Took the Rhode Island bar in that year?
A Yes.
Q Are you licensed in any other state other than Rhode Island?
A Yes.
Q What state or states?
A Massachusetts.
Q Became licensed in what year?
A 1981.
Q How long have you been general counsel for Johnson & Wales?
A Since 2000.

A To the best of my knowledge it did.
Q Showing you which I think, John, you have, is marked as Plaintiff's 3 and it's a draft of a Crime Alert?
A Yes.
Q Showing you Plaintiff's 3, to your knowledge is that the draft Crime Alert that Mr. Johnston sent Sandra Lawrence on September 20, 2004?
A To the best of my knowledge, yes.
Q Now, do you know on or about September 20, 2004, whether Ms. Lawrence showed you Plaintiff's 3, the draft Crime Alert?
Just so we go back and there is no confusion.
A Could you repeat the question?
Q Sure. What I'm understanding you to tell me is that Plaintiff's 4, the bottom e-mail from Johnston to Lawrence on Monday, September 20, 2004 provided Lawrence with Plaintiff's 3, the draft Crime Alert?
A To the best of my knowledge, yes.
Q Did Ms. Lawrence show you Plaintiff's 3 that she received from Johnston?
A To the best of my knowledge, yes.
Q Do you have any memory at all as to whether it was Monday, September 20th, when she showed it to you?
A No.

September 20th and the e-mail of September 21, you and Ms. Lawrence talked about the Crime Alert?

A Yes.

Q Was it just the two of you or did it involve any other individuals?

A I don't recall.

Q What was the substance of that discussion?

A To the best of my recollection she called to inquire about describing the alleged assailant. We discussed how we would describe Mr. Havlick and decided that it made the most sense to identify him by name because we knew who he was.

Q Now, if you would take a look at Plaintiff's 3 which is the draft Crime Alert and Plaintiff's 5 which is the Crime Alert that names Havlick, are you looking at both of those?

A Yes, I am.

Q In fact the Crime Alert that names Havlick which is Plaintiff's 5, is that to your knowledge the Crime Alert that was published?

A To the best of my knowledge, yes.

Q Now, the draft Crime Alert, Plaintiff's 3, is different from the Plaintiff's 5 at least in one respect and that is that Havlick is specifically referenced in 5 and he's

not mentioned in 3; is that correct?
A That's correct.
Q In Plaintiff's 3, that is the draft, it indicates that two students were assaulted in the first line, does it not?
A Yes.
Q That fact isn't referenced in Plaintiff's 5; is that fair to say?
A Yes.
Q The fact that the altercation apparently involved fraternity members, specifically ZBT members, is not referenced in Plaintiff's 3 but is referenced in Plaintiff's 5; is that correct?
A Yes.
Q As to those two additional changes, the fact that the draft references two students who were assaulted whereas Plaintiff's 5 does not, and the fact that ZBT fraternity members are referred to in 5 but 3 does not contain reference to a fraternity of any kind; do you know why those changes were made?
A I do not know why the first change you referred to was made. The second change that included the identification of ZBT was made on my advice.
Q So there were thus far as I'm understanding you two

directions you gave to Ms. Lawrence after looking at the draft, and you correct me if I'm wrong, one was to include reference to ZBT Fraternity members and the other was to identify Havlick by name; is that fair to say?
A With regard to identifying ZBT, that was my advice to her and my recommendation; with regard to including Christopher Havlick by name, that was in response to her question about how we would identify the alleged assailant, I advised her to identify him by name since we knew his identity.
Q Well, the answer to my question would be yes then as I'm understanding you; in other words, regardless of what prompted you to give the advice, you suggested that Christopher Havlick be referred to by his name in the Crime Alert that was published?
A Yes.
Q Now, was it at that time that you, when I say at that time, was it in and around this time when you had occasion to go back and look at Plaintiff's 15?
A I don't recall.
Q I was assuming, and correct me if I assumed incorrectly, that you would have been either looking at Plaintiff's Exhibit 15 or going back to that 2003 time period before Plaintiff's 5 was published?

A I recall being aware of the incident involving Mr. Alegria and the Crime Alert; I do not recall whether I actually looked at that Crime Alert.
Q You're being aware of the Crime Alert, although you're not sure if you actually looked at Plaintiff's 15, was for what reason, what was it about Plaintiff's 15, whether you looked at it or not, before 5 was published?
A I was considering the issue of whether this particular incident involving Mr. Havlick represented a continuing threat or a threat to the University community. One of the things that I took into consideration in making that determination was that I was aware of two other incidents within the previous year or so that involved members of fraternities, either recognized or unrecognized at Johnson & Wales, threatening or assaulting students who had pledged the fraternities and then withdrawn their pledges.
Q Was one of those two incidents the incident that gave rise to the publication of Crime Alert, Plaintiff's 15?
A Yes.
Q At that time this ATO fraternity was not a recognized fraternity at Johnson & Wales; is that correct?
A Yes.
Q So that the other incident, without naming students,

involved what fraternity?
A ZBT.
Q Is that the same fraternity that you came to realize that Havlick was associated with?
A Yes.
Q Or a member of?
A Yes.
Q And the ZBT incident occurred in what time period?
A April 2004.
Q What happened at that point, I'm not interested in names of students, I just want a general description of what happened?
A To the best of my recollection members of ZBT threatened a student who had pledged the fraternity and then withdrawn.
Q Did that particular incident give rise to student disciplinary proceedings?
A I don't know.
Q Did that incident involve Christopher Havlick?
A No.
Q Was there any final determination as to whether that accusation made by a student who had pledged the fraternity and then withdrawn ever determined to be valid?

A Because we are required to publish them by the laws and regulations that are referred to on Plaintiff's 12.
Q Is it your understanding in looking at Plaintiff's 12 that 20 USC, Section 1092 is a Federal Statute?
A Yes.
Q And that 34 CFR 668.46 is a Department of Education Regulation issued pursuant to that statute?
A Yes.
Q So that as to specifics with regard to a Crime Alert you would as chief counsel be looking more at the CFR than you would be at the 20 USC Section 1092 I take it?
A I've looked at both. They're pretty similar. I have the CFR handy and when a question arises regarding a Timely Alert I look back at it just to make sure I recall what it says.
Q So is it fair to say that to your knowledge Johnson & Wales University publishes Crime Alerts because it is required to through Federal Law?
A Yes.
Q So because it's required to publish Crime Alerts through Federal Law, do you as a former associate counsel and now chief counsel review the statute and the federal regulation pursuant thereto to refresh yourself as to what is required with regard to the publication of the

Crime Alert?
A From time to time, yes.
Q One of the things that's required that you've already addressed is that the Crime Alert be published in a situation where the perpetrator's acts are seen as a threat to members of the campus community?
A Yes.
Q In connection with the Havlick Crime Alert, Plaintiff's 5, did you look at 34 CFR for any other reason?
A Yes.
Q What other reason?
A There are really three determinations I make when I'm reviewing an Incident Report or advising -- excuse me, when I'm advising on a Crime Alert; and the three determinations are: Is the crime that was reported a crime that's covered by 34 CFR Part 668.46; has it been reported to campus security authorities or the local police; and do I consider it to be a threat to students and employees in light of the fact that this section charges us with issuing and posting these Timely Warnings in a manner that is timely and will aid in the prevention of similar crimes.
Q Now, I noticed in those three considerations not one of them relates to where the alleged crime occurred?

applicable to that location; isn't that right?
A Yes.
Q And in this particular incident we've got police and incident reports referencing a 25 Richmond Street and we have a Crime Alert that references Pine Street; is that true?
A That's correct.
Q Does the specific location of the crime matter to you as chief counsel or did it at the time, let me go back now.
Did the specific location of this crime matter to you as chief counsel with reference to the applicability of the Clery Act?
A If by specific location you mean in front of a door marked with the number 25 on Richmond Street, to that point of specificity it did not matter. The general location of the incident did matter to me.
Q When you say "the general location", what do you mean by those words?
A That it was in the vicinity of our campus and it was an area that our students were known to frequent.
Q That concern of yours, that it was in the vicinity of the campus and that it was in an area where your students would tend to frequent, what is it about the federal regulation, the federal statute, or any other legal

Q I see.
A And in fact the report other than the reference to a knife didn't turn out to be incorrect.
Q Well, even the Johnson & Wales panel dismissed the charge that Havlick had a knife; isn't that fair to say?
A That's correct.
Q That decision was made how long --
MR. MAHONEY: Strike that.
Q Was that decision by the panel made before or after the publication of Plaintiff's 5?
A My records indicate that decision was made before.
Q So that you had a Disciplinary Board that exonerated Havlick of having a knife at the time of whatever incident took place; is that correct?
A Yes.
Q You had a Board that made that determination?
A Yes, we did.
Q The Board made that determination before the Crime Alert, Plaintiff's 5, was published?
A That's what my records indicate.
Q Yet the University published the Crime Alert which indicated that Havlick had a knife; correct?
MR. TARANTINO: Objection.
A The Crime Alert did not specifically identify Havlick as

under appropriate circumstances the University has obligations to give warning to people under the Clery Act?

A Yes.

Q I think we also can readily agree that students at the University charged with disciplinary infractions have rights to a hearing to determine whether they're ultimately found guilty or not guilty of those alleged violations?

A We grant them those rights.

Q Right, so they have those rights?

A At Johnson & Wales, yes.

Q Did you in September of '04 see any conflict between the two rights as it relates to Havlick?

MS. BENNETT: You're asking if I saw a conflict between Havlick's right to have a hearing and the University's obligation to post a Crime Alert?

MR. MAHONEY: That was probably better asked than I asked, but that's exactly what I'm asking you.

A No, the only conflict I can think of that might arise is if the panel, who are our finders of fact, were somehow influenced by a Crime Alert before they sat down to hear the case. In which case if they had some predisposition,

they would hopefully acknowledge that and ask to have another person -- if they had a conflict or predisposition, they would acknowledge it, and another person would step in as the member of the panel. In this particular case since the panel met prior to the publication of the Crime Alert I couldn't-- you know looking in hindsight I certainly don't see any conflict.
Q But Mr. Halvlik filed an appeal from his conviction of two of the Disciplinary Code sections, did he not?
A Yes. And conviction is a strong word. We like to say found responsible for.
Q Well, I can assure if you're ultimately dismissed from the school, nomenclature is probably irrelevant, but none the less, Havlick, we will agree, appealed the finding that he was responsible for having violated two of the Disciplinary Codes; correct?
A Two sections, yes.
Q You have since found out, whether you knew at the time or whether it's after the fact, that that decision relative to his appeal wasn't made until September 29th; fair to say?
A Yes, that's correct.
Q That would be approximately what, a week after the publication of the Crime Alert?

is that "the decision of the Conduct Review Hearing is affirmed, and you must comply with the sanction(s) imposed immediately"?

A Right.

Q Isn't that what it says?

A That's what it says.

Q So that if the hearing officer affirms the decision of the Board that the violation did occur, does the hearing officer have any jurisdiction to reduce the sanctions?

A This doesn't -- we don't put in this particular piece of paper in this notice why the decision is affirmed; but the decision isn't affirmed because the appeal officer found that the panel was correct in its findings of fact which is what you keep trying to explain.

Q No, I'm not.

A The reason the decision was affirmed was because your client didn't meet or establish that any of the grounds for not affirming the decision for the appeal had been met.

Q But this is one time I know you didn't answer my question.

MR. TARANTINO: Listen to the question.

A Try it again.

Q I'm asking you if the appellate officer--

A Yes.

Q -- affirms, as this officer did, the decision of the Board, does the officer have discretion to modify the sanction imposed upon the student?

A If the officer affirms the decision made by the Board does the officer have discretion? In some cases yes; for example, when the student appeals that the punishment was out of proportion to the findings that the hearing panel made.

Q Yes.

A In which case they would check off this one and say upon review of your appeal, I have decided to modify the sanction.

Q But the fact of the matter is that given this discretion to modify the sanction in the event that the underlying guilty finding is upheld, or alternatively under the guidelines that you've addressed that decision is reversed, while this process was unfolding the Crime Alert, Plaintiff's 5, had been published?

A Yes, it was published on September 21st and the appeal decision was concluded on September 29th.

Q Did the appellate officer see the Crime Alert when it was posted?

A I don't know.

DRAFT

# CRIME ALERT
# ASSAULT with a Knife

Friday, September 17, 2004 at 12:00 am two students were assaulted while walking on Pine Street by Club Ultra. One student sustained a head injury when he fell after he was struck following a verbal altercation. The victims report a knife was shown during the incident. Police were notified.

**Crime Prevention Tip:**

Stay in well lit, well populated places.
Notify police or security of any suspicious activity immediately.

Distributed on:
September 21, 2004

PLAINTIFF'S EXHIBIT
3

# CRIME ALERT
# ASSAULT

On Friday, September 17, 2004 at 12:00 am, three students were walking on Pine Street (heading towards the Providence Performing Arts Center) after leaving Club Ultra. The three students were approached by two students who are ZBT fraternity members. The ZBT members were angry that the two students had chosen not to join the fraternity. After a verbal altercation, one student was struck and fell to the ground. The student sustained a head injury when he fell to the ground. The victims stated that a knife was shown during the incident.

The assailant was identified as Christopher Havlik.

Providence Police were notified.

**Crime Prevention Tip:**

Stay in well lit, well populated places.
Notify police or security of any suspicious activity immediately.

Distributed on:
September 21, 2004

PLAINTIFF'S EXHIBIT
5