# EXHIBIT 1

gave to the University with respect to Havlick, we've waived that. To the extent that any questions would call for you to render separate or to give an answer about any separate advice you gave to the University or its members about the Alegria Alert that is unrelated to Havlick then that has not been waived; and if that has happened, the privilege still applies. Did you understand what I said?

MS. BENNETT: I do.

MR. MAHONEY: Let me ask you another question.

Q What if anything did you specifically do as it relates to Plaintiff's 15 other than give advice; did you edit the Crime Alert personally?

A I don't recall.

Q Now, Plaintiff's 15 which was published in 2003 specifically identifies a student who was going to the school at the time, Steven Alegria; is that correct?

A Yes.

Q And that Crime Alert, meaning Plaintiff's 15, specifically references the fact that Steven Alegria had been arrested and charged with assault with a deadly weapon in connection with the incident. Do you know as of the time that this Crime Alert, Plaintiff's 15 was

Crime Alert; correct?
A Correct.
Q In '05 and '06, were there Crime Alerts that were published regarding an alleged crime where the perpetrator is known to be a Johnson & Wales student?
A No. Well, let me clarify my answer, it was not known at the time the Crime Alert was posted to be a Johnson & Wales student.
Q Were there any Crime Alerts published before 2001 to your knowledge where the alleged perpetrator of the crime at the publication of the Crime Alert was a Johnson & Wales student?
A I don't know.
Q When Dean Martel testified here, it was his best recollection that there were five or six Crime Alerts to his knowledge that related to Johnson & Wales students as being the alleged perpetrator.
My question is: Did you know that, did you know he testified accordingly?
A Yes.
Q Is that testimony of Dean Martel something as a factual matter that you agree with, disagree with, or don't have enough knowledge to do either?
A Subsequent to his deposition, Dean Martel's deposition,

he provided me with a list of Crime Alerts that ultimately turned out to have Johnson & Wales students identified as the perpetrators so his testimony is basically correct as it was to the best of his knowledge at the time of his deposition.

Q I just want to make sure I understand this: After his testimony, Dean Martel provided you with certain Crime Alerts; is that correct?

A No.

Q It's probably me. What did Dean Martel provide to anybody if anything after his deposition?

A He provided to me a list of Crime Alerts and associated incident reports where the perpetrator was subsequently identified as a Johnson & Wales student but was not named in the incident report.

Q The student was not named in the incident report and so he or she was not named in the Crime Alert?

A Correct.

Q Are you saying that at the time the Crime Alert was published, the University did not know that the perpetrator of the alleged crime was a student?

A Correct.

Q That is something that you determined from taking a list of the Crime Alerts provided to you by Dean Martel and

comparing them against the incident reports that related to the incident?
A Correct, as well as comparing them to the judicial or disciplinary files of the students who were later identified.
Q So you were able to determine that the date the students were identified post dated the publication of the Crime Alert?
A Yes; with the exception of one which I have not yet been able to determine.
Q Why is that?
A I don't have the files. I haven't received the file. They're looking for it.
Q In relation to the Havlick matter, what was your first awareness of the fact that there had been an incident involving him?
A I don't precisely recall, but to the best of my recollection I believe that I was informed that there had been a serious injury to a student several days prior to my being informed.
Q When you say you were informed, do you remember who informed you of this alleged serious injury?
A Probably Sandy Lawrence.
Q Sandy Lawrence is who?

applicable to that location; isn't that right?
A Yes.
Q And in this particular incident we've got police and incident reports referencing a 25 Richmond Street and we have a Crime Alert that references Pine Street; is that true?
A That's correct.
Q Does the specific location of the crime matter to you as chief counsel or did it at the time, let me go back now.
Did the specific location of this crime matter to you as chief counsel with reference to the applicability of the Clery Act?
A If by specific location you mean in front of a door marked with the number 25 on Richmond Street, to that point of specificity it did not matter. The general location of the incident did matter to me.
Q When you say "the general location", what do you mean by those words?
A That it was in the vicinity of our campus and it was an area that our students were known to frequent.
Q That concern of yours, that it was in the vicinity of the campus and that it was in an area where your students would tend to frequent, what is it about the federal regulation, the federal statute, or any other legal

matter that would make you concerned about that?

If you specify, if you can, where in the federal regulation there is language such that you would be concerned about the location of the incident as being in the general vicinity of the campus as making that statute applicable?

A First, in the section we've already referred to in Plaintiff's 16, the Timely Reports are intended to aid in the prevention of similar crimes. So when it is in an area that I know that our students frequent, it is an area that we feel that we need to issue Crime Alerts for crimes that occur in those areas. If you will give me a minute.

Q Sure.

A I don't know without looking back at the regulations now what the regulation, I'd have to read it again, what the regulation provides in terms of areas contiguous to the campus.

Q Are you saying that you did or did not read that before the publication of Plaintiff's 5?

A I don't recall.

Q Why don't you take a look at that then.

A I would say it is Subsection C.

Q What page are you on?

A Page 4 of 6.
Q Page 4 of 6, Subsection C, is that Crime Statistics?
A Yes.
Q All right, that reads, "Crimes that must be reported. An institution must report statistics for the three most recent calender years concerning the occurrence on campus, in or on noncampus buildings or property, and on public property of the following that are reported to local police agencies or to a campus security authority". Did I read that correctly?
A Yes, you did.
Q Are you telling me that that paragraph is the basis upon which you felt that the location of this alleged crime, wherever it was, applied to the statute?
A Yes.
Q Well, aren't those terms that are used in that paragraph defined earlier in the Code of Federal Regulations. In other words, it says public property. So in other words, if Mr. Havlick was on vacation over the summer in California and was involved in some alleged crime at a public building, would that impose an obligation on Johnson & Wales?
A There is a definition of public property, it's on Page 2 of 6.

Q My question is: At the time of the publication of Plaintiff's 5, did you look at that definition?
A I don't recall.
Q And the public property definition reads what?
A "All public property, including thoroughfares, streets, sidewalks, and parking facilities, that is within the campus, or immediately adjacent to and accessible from the campus."
Q Obviously, well, nothing's obvious.
Did this incident to your knowledge occur within the campus?
A To my knowledge, no.
Q In fact, the Incident Report, Plaintiff's 2, specifically indicates that it occurred off campus; is that correct?
A Incident Report indicates that it occurred--
Q I'm referring to Page 1 at the very top left-hand corner, "location of occurrence, off campus"?
A Yes, I understand what you're referring to. But the Incident Report itself says that the three were walking up Pine Street towards the Providence Performing Arts Center when a student was approached by a ZBT fraternity member, Christopher Havlick; so why the location of occurrence says 25 Richmond Street and the text of the Incident Report says they were walking up Pine Street, I

do not know. I have not gone and personally looked, perhaps the building is on the corner, I'm just not sure.

Q But you would agree, accurate or not, that the location of the occurrence on the Incident Report prepared presumably by a security officer at Johnson & Wales indicated the incident was off campus?

A Correct.

Q And did you have any facts available to you in September of '04 that that contention was inaccurate that the incident occurred off campus?

A No.

Q So if that's true, then we would be talking about under public property, if you look at Page 2 of 6, it indicates all public property, including thoroughfares, streets, sidewalks, and parking facilities, that was within the campus, we would not be talking about that. We would then be talking about all public property, including streets, thoroughfares, sidewalks, and parking facilities that are immediately adjacent to and accessible from the campus; is that correct?

A Correct.

Q Is that a description of where an incident would occur that would compel issuance of a Crime Alert that you were conscious of before Plaintiff's 5 was published?

A Location of the incident in and of itself does not compel the publication of a Crime Alert. You need to meet the three criteria.
Q I know that. But the compulsion to issue the Crime Alert should those three criteria be met also relates to where the incident happened; is that correct?
A Correct.
Q Because if a Johnson & Wales student living out of state was involved in a criminal incident in his or her home state, that would not compel Johnson & Wales to issue a Crime Alert about that student, would it?
A No, it would not, I don't believe.
Q So that the location of the incident would be of legal significance as it relates to the application of the Clery Act; is that true or not true?
A I'd like to clarify my previous answer. When I said, no, it does not, I haven't done the legal research to see whether if a student committed a crime in another state or some other area that we considered to be a threat to our students or employees that we would not be compelled. So I'm not sure of the answer to that.
Q Well, are you suggesting that Page 2 of 6 which is this 34 CFR 668.46 which defines public property, are you suggesting that there may be compulsion of the University

another thing to determine that in fact what is alleged is fact. As a lawyer did you understand that difference in concept, the difference between allegation and fact?
A I do understand that concept. It wasn't relevant to my determinations when I was advising Sandy Lawrence.
Q Okay. Let's go to Plaintiff's 5. Ms. Bennett, when you were advising Ms. Lawrence, you weren't concerned between publishing a Crime Alert that was based on fact as opposed to a Crime Alert that was based on allegation?
A My obligation under -- my interpretation, excuse me, of the regulations is that we are required to issue a Crime Alert when a crime is reported, not when a determination of guilt or innocence or responsibility or not responsibility is made.
Q Now, Plaintiff's 5, is entitled "Crime Alert Assault", I interpret that to mean that you, when I say you, that the University wanted the campus community to know that a crime of assault had occurred; is that correct or not?
A That's not correct.
Q Where does it say in here that this is simply alleged to have occurred?
A It does not state that in here.
Q In fact, the plain ordinary interpretation of this publication, Plaintiff's 5, is that in fact a crime of

under appropriate circumstances the University has obligations to give warning to people under the Clery Act?

A Yes.

Q I think we also can readily agree that students at the University charged with disciplinary infractions have rights to a hearing to determine whether they're ultimately found guilty or not guilty of those alleged violations?

A We grant them those rights.

Q Right, so they have those rights?

A At Johnson & Wales, yes.

Q Did you in September of '04 see any conflict between the two rights as it relates to Havlick?

MS. BENNETT: You're asking if I saw a conflict between Havlick's right to have a hearing and the University's obligation to post a Crime Alert?

MR. MAHONEY: That was probably better asked than I asked, but that's exactly what I'm asking you.

A No, the only conflict I can think of that might arise is if the panel, who are our finders of fact, were somehow influenced by a Crime Alert before they sat down to hear the case. In which case if they had some predisposition,

they would hopefully acknowledge that and ask to have another person -- if they had a conflict or predisposition, they would acknowledge it, and another person would step in as the member of the panel. In this particular case since the panel met prior to the publication of the Crime Alert I couldn't-- you know looking in hindsight I certainly don't see any conflict.

Q But Mr. Halvlik filed an appeal from his conviction of two of the Disciplinary Code sections, did he not?

A Yes. And conviction is a strong word. We like to say found responsible for.

Q Well, I can assure if you're ultimately dismissed from the school, nomenclature is probably irrelevant, but none the less, Havlick, we will agree, appealed the finding that he was responsible for having violated two of the Disciplinary Codes; correct?

A Two sections, yes.

Q You have since found out, whether you knew at the time or whether it's after the fact, that that decision relative to his appeal wasn't made until September 29th; fair to say?

A Yes, that's correct.

Q That would be approximately what, a week after the publication of the Crime Alert?