UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CHRISTOPHER HAVLIK,
Plaintiff,

v. CA 05-510 ML

JOHNSON & WALES
UNIVERSITY
Defendant.

MEMORANDUM AND ORDER

This case is before the Court on a motion for summary judgment filed by Defendant, Johnson & Wales University ("JWU") pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendant's motion is granted.

I. Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational factfinder could resolve the issue in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Id. Once the movant has made the requisite showing, the nonmoving party "may not

rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Continental Casaulty Co. v. Canadian Universal Insurance Co., 924 F.2d 370 (1st Cir. 1991).

II. Facts

At approximately 12:00 a.m. on Friday, September 17, 2004, an altercation occurred between two JWU students in the area of Richmond and Pine Streets in Providence. During the altercation, Christopher Havlik ("Plaintiff") "threw a punch" and struck Donald Ratcliffe ("Ratcliffe"). Defendant's Motion for Summary Judgment Ex. 4. As a result of being struck, Ratcliffe fell and suffered a fractured skull and a concussion. The Providence Police responded to the incident and identified Elyse Okolita ("Okolita") as a one of the witnesses to the incident.

An officer from JWU's Department of Campus Safety and Security ("Campus Safety") conducted an internal investigation into the incident. On September 17, 2004, at approximately 12:10 p.m., the officer spoke to John Curely ("Curely"), another witness to the incident, and produced an "incident report." According to Curely, Plaintiff "swung" at him missing Okolita "by inches. He swung again, and struck Ratcliff[e] in the head. Ratcliff[e] fell to the ground, striking his head on the concrete." Defendant's Reply Memorandum Ex. 3. Curely stated that he "freaked out" because "blood was coming out of Ratcliff[e]'s left ear." Id. Curely also stated that Plaintiff "flashed a knife during the altercation." Id. On Monday, September 20, 2004, JWU's Student Conduct Office issued Plaintiff a temporary notice of suspension from JWU alleging "[a]ssault of another student, alleged possession of a knife, [and] [c]onduct that would violate federal, state or local laws." Defendant's Motion for Summary Judgment Ex. 6. The

notice advised Plaintiff that the suspension was temporary pending a student conduct review hearing.

On Tuesday, September 21, 2004, at approximately 10:50 a.m., Okolita provided a witness statement to the Providence Police about the incident. Okolita stated that Plaintiff "just threw a punch past me and knocked [Ratcliffe] out. [Ratcliffe] went straight back. [Plaintiff] had a pocket knife in one of his hands." Defendant's Motion for Summary Judgment Ex. 4. At approximately 11:15 a.m. on the same day, the Student Conduct Office held a student conduct review hearing regarding the September 17 incident. Plaintiff explained his version of the altercation to the student conduct hearing panel. The hearing panel also heard from two witnesses presented by Plaintiff. On the same day, at approximately 4 p.m., Campus Safety posted a notice concerning the incident between Plaintiff and Ratcliffe. The notice, titled "CRIME ALERT" and "ASSAULT" stated that

> [o]n Friday, September 17, 2004, at 12:00 am, [sic] three students were walking on Pine Street (heading towards the Providence Performing Arts Center) after leaving Club Ultra. The three students were approached by two students who are ZBT fraternity members. The ZBT fraternity members were angry that the two students had chosen not to join the fraternity. After a verbal altercation, one student was struck and fell to the ground. The student sustained a head injury when he fell to the ground. The victims stated that a knife was shown during the incident. The assailant was identified as Christopher Havlik. Providence Police were notified . . . .

Defendant's Motion for Summary Judgment Ex. 8.

At some point before the Crime Alert was issued, Barbara Bennet ("Bennet"), general counsel for JWU, suggested that the Crime Alert refer specifically to Plaintiff by name and also list his fraternity membership. At the time Campus Safety issued the Crime Alert, it did not know what had transpired at Plaintiff's student conduct hearing. On Wednesday, September 22,

2004, Plaintiff received a letter from the Student Conduct Office notifying him of the hearing panel's decision finding him "responsible" for "[a]ssault of another student" and "[c]onduct that would violate federal, state or local laws" but "not responsible" for "alleged possession of a knife." Defendant's Motion for Summary Judgment Exs. 6, 9. As a result of the hearing panel's decision, Plaintiff was dismissed from JWU. The letter also stated that Plaintiff could appeal the dismissal decision "in writing within two . . . business days. . . ." and that his appeal officer was Veera Sarawgi ("Sarawgi"). Id. at Ex. 9. The letter specifically informed Plaintiff that his "[a]ppeal [o]fficer must receive [his] appeal letter no later than 4 p.m." on September 26. Id.

On September 22 Plaintiff and his mother initiated a meeting with JWU's Vice President of Student Affairs, Ronald Martel ("Martel").[1] At this meeting Martel accused Plaintiff of lying and used the word "thugs" to describe the members of Plaintiff's fraternity. Plaintiff's Opposition to Motion for Summary Judgment, Martel Deposition at 27. At some point after this meeting Plaintiff exercised his right to appeal the decision of the hearing panel.[2] In spite of the appeal instructions contained in the hearing panel's decision, Plaintiff forwarded his appeal letter to Martel. Martel then forwarded the letter to Sarawgi by interoffice mail. Plaintiff's letter was received by the Office of Student Affairs on September 27, 2004. Before deciding Plaintiff's appeal, Sarawgi asked Martel if he saw any reason why Plaintiff should not be dismissed from JWU. Martel informed Sarawgi that he "did not." Plaintiff's Opposition to Motion for Summary

---

[1]At oral argument on the motion for summary judgment, Plaintiff's counsel clarified that the meeting was initiated by Plaintiff and his mother. Martel's title, according to his deposition, is Vice President of Student Affairs, however, both parties refer to him as a Dean.

[2]There is some dispute about whether Plaintiff filed his appeal before or after he met with Martel to discuss the incident. For purposes of this memorandum and order, the Court adopts Plaintiff's version of events as clarified at oral argument on the motion for summary judgment.

Judgment, Martel Deposition at 48. On September 29, 2004, Sarawgi affirmed Plaintiff's dismissal from JWU.

Plaintiff was charged with assault by the Providence Police Department. A state district court judge found Plaintiff guilty and sentenced Plaintiff to one year of probation and twenty-five hours of community service. Plaintiff appealed the district court decision to the state superior court. In May 2005 the matter was tried before a jury and the jury returned a verdict of not guilty. Plaintiff now sues JWU for defamation and breach of contract.

## III. Analysis

### A. Defamation

Plaintiff first contends that the Crime Alert published by JWU is defamatory. In a defamation suit under Rhode Island law, "the plaintiff must prove: (1) the utterance of a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence; and (4) damages." Mills v. C.H.I.L.D., Inc., 837 A.2d 714, 720 (R.I. 2003). "A defamatory statement consists of [a]ny words, if false and malicious, imputing conduct which injuriously affects a [person's] reputation, or which tends to degrade him [or her] in society or bring him [or her] into public hatred and contempt. . . ." Wilkinson v. State Crime Lab. Comm'n., 788 A.2d 1129, 1142 (R.I. 2002) (internal quotation marks and citation omitted). "[W]hether a particular statement or conduct alleged to be defamatory is, in fact, defamatory is a question of law for the court to decide." Alves v. Hometown Newspapers, Inc., 857 A.2d 743, 750 (R.I. 2004). Truth is an absolute defense. Lundgren v. Pawtucket Firefighters Ass'n Local No. 1261, 595 A.2d 808, 815 (R.I. 1991).

Plaintiff argues that the Crime Alert is defamatory because (1) it identified him as the

"assailant, or the one who perpetrated" a crime; (2) it provided an inaccurate motive for the alleged assault; (3) it "makes reference to the fact that a knife was used during the incident" in spite of the finding by JWU that Plaintiff was found "not responsible" for "using" a knife;[3] and (4) it identified several individuals as victims. Plaintiff's Opposition to Summary Judgment at 4-5. JWU avers that the Crime Alert accurately reflects what was communicated to the Providence Police and to the Campus Safety officer. Consequently, JWU concludes that the statements contained in the Crime Alert are true and as such are not defamatory.

For purposes of this decision the Court assumes without deciding that the Crime Alert is defamatory. See Kevorkian v. Glass, 913 A.2d 1043, 1047 (R.I. 2007) (assuming without deciding that the phrase used by defendant was defamatory). The Court does so, however, because JWU's publication of the Crime Alert was covered by a qualified privilege. Id. It is well settled in Rhode Island that "[t]he publisher of an allegedly defamatory statement may avoid liability if he or she is privileged to make the statement in question." Mills, 837 A.2d at 720; see also Kevorkian, 913 A.2d at 1049. "The determination of whether the privilege exists on the facts of a particular case is a question of law for the court to decide." Mills, 837 A.2d at 720. A qualified privilege

> permits a person to escape liability for a false and defamatory statement made about another if the occasion for the publication is such that a publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third person[s], or certain interests of the public.

[3]Although Plaintiff argues that the Crime Alert "makes reference to the fact that a knife was used during the incident" the Crime Alert actually states that a "knife was shown during the incident." Defendant's Motion for Summary Judgment Ex. 8. Additionally, JWU found Plaintiff "not responsible" for possession of a knife, not "using" a knife. Id. at Exs. 6,9.

Ponticelli v. Mine Safety Appliance Co., 247 A.2d 303, 305-306 (R.I. 1968).

JWU avers that it published the Crime Alert because it was required to do so by federal law, specifically the Clery Act ("Act"). See 20 U.S.C. § 1092(f). Plaintiff contends that JWU was not legally required to publish the Crime Alert, and consequently, is not protected by the qualified privilege. The Act "requires United States colleges and universities to collect and publish data on student safety, campus security policies, and campus crime statistics." Allocco v. City of Coral Gables, 221 F. Supp. 2d 1317, 1348 n.12 (S.D. Fla. 2002), aff'd, 88 F. App'x 380 (11th Cir. 2003); see also Bonnie S. Fisher, Making Campuses Safer for Students: The Clery Act as a Symbolic Legal Reform, 32 Stetson L. Rev. 61 (2002). The Act also mandates that all universities and colleges in the United States that participate in federal student financial assistance programs

> shall make timely reports to the campus community on crimes considered to be a threat to other students and employees. . . that are reported to campus security or local law police agencies. Such reports shall be provided to students and employees in a manner that is timely and that will aid in the prevention of similar occurrences.

20 U.S.C. § 1092(f)(3) (emphasis added). The Act requires that JWU issue timely reports for the following crimes that are reported to campus security or to the police: murder, sex offenses, robbery, aggravated assault, burglary, motor vehicle theft, manslaughter, arson, and certain liquor, drug, and weapons violations. 20 U.S.C. §§ 1092(f)(3) & (f)(1)(F)(i). In order to meet the reporting requirement, however, the crime must occur "on campus . . . [or] on public property . . ." Id. § 1092(f)(1)(F). It is JWU's position that the Crime Alert was a timely report made pursuant to the Act.

Plaintiff first argues that JWU was not required by the Act to publish the Crime Alert

because it is unclear where the incident occurred. JWU avers that the incident was a reportable offense because it occurred in an area defined as "public property" by the Act. JWU argues that the incident occurred at the sidewalk in front of 25 Richmond Street. Plaintiff does not identify the exact location of the incident but avers that the incident took place "on a sidewalk on Richmond Street that was either adjacent to a lot owned by [JWU] or Griffin Realty Enterprises, Inc." ("Griffin Realty"), a wholly owned subsidiary of JWU. Plaintiff's Supplemental Memorandum at 2.

The Act defines the term "public property" as

> all public property that is <u>within the same reasonably contiguous geographic area</u> of the institution, such as a <u>sidewalk</u>, a street, other thoroughfare, or parking facility, <u>and</u> is <u>adjacent</u> to a facility <u>owned or controlled</u> by the institution if the facility is used by the institution in direct support of, or in a manner related to the institution's educational purposes.

20 U.S.C. § 1092(f)(6)(A)(iii) (emphasis added). In determining the meaning of a statute, the Court begins with its language. <u>Succar v. Ashcroft</u>, 394 F.3d 8 (1st Cir. 2005). The Court construes the language of a statute "in its context and in light of the terms surrounding it." <u>Id.</u> at 23 (internal quotation marks and citation omitted). The plain meaning of a statute's text must be given effect "unless it would produce an absurd result or one manifestly at odds with the statute's intended effect. . . ." <u>Seahorse Marine Supplies, Inc. v. Puerto Rico Sun</u>, 295 F.3d 68, 74 (1st Cir. 2002).

The police report identifies the location of the incident as "[h]ighway/[r]oad/[a]lley" at 25 Richmond Street. Defendant's Motion for Summary Judgment Ex. 1. Okolita's witness statement avers that the incident occurred while "on the <u>sidewalk</u> near the police substation (Richmond and Pine)." <u>Id.</u> at Ex. 4 (emphasis added) (capitals omitted). Ratcliffe's witness

statement avers that the incident occurred while "standing on the sidewalk on Richmond St. near Pine St. . . . . I fell back and hit my head on the sidewalk." Id. at Ex. 3 (emphasis added) (capitals omitted). JWU's incident report identifies the location of the incident as "[o]ff [c]ampus . . . [i]n [f]ront of 25 Richmond St[.]" Defendant's Reply Ex. 3.

Although the parties dispute the exact location of the incident, it is clear that the incident took place on the sidewalk of Richmond Street near Pine Street in Providence. The parties agree that the location of the incident is a portion of the sidewalk on Richmond Street that is adjacent to property made up of one parcel of land owned by JWU and eight parcels of land owned by Griffin Realty. The nine parcels of land make up what JWU refers to as the Richmond Lot. JWU uses the Richmond Lot for the primary purpose of providing free parking for JWU employees. The sidewalk on Richmond Street adjacent to the Richmond Lot is within the same reasonably contiguous geographic area of JWU.[4] See 29 U.S.C. § 1092(f)(6)(A)(iii). JWU controls the Richmond Lot and has engaged a third party to manage it. The Richmond Lot also contains parking spaces for paid transient parking. Of the 178 spaces in the Richmond Lot, in September 2004, approximately 127 spaces were allocated for JWU employees. With respect to the remaining spaces allocated to transient parking, in September 2004, at least ninety percent of

---

[4]Plaintiff argues that the location of the incident, the sidewalk on Richmond Street adjacent to the Richmond Lot, is not in the same reasonably contiguous geographic area of JWU. See 29 U.S.C. § 1092(f)(6)(A)(iii). Plaintiff's argument ignores the fact that JWU's Providence campus is in an urban setting. The Act provides that the term "public property" means, inter alia, all public property that is within "the same reasonably contiguous geographic area [of JWU], such as a sidewalk . . . ." Id. (emphasis added). Contiguous means "touching; in contact" or "in close proximity without actually touching; near." Random House Unabridged Dictionary 439 (2d ed. 1993). The Court has reviewed the street maps submitted by the parties which identify both the applicable area of Richmond Street and the location of nearby JWU campus facilities. The area where the incident occurred is certainly in close proximity to JWU's dispersed urban campus. Additionally, the Richmond Lot borders four separate parcels of land maintaining JWU campus facilities.

those spaces were used by JWU students.[5] JWU students and employees use the Richmond Lot and Richmond Street sidewalks on a daily basis during the academic year. Campus Safety patrols the Richmond Lot and Richmond Street sidewalks.

It is clear that the location of the incident, the Richmond Street sidewalk, is within the "same reasonably contiguous geographic area" of JWU and is "adjacent"[6] to the Richmond Lot, a "facility owned or controlled" by JWU.[7] See 20 U.S.C. § 1092(f)(6)(A)(iii) (emphasis added). The record reflects that the Richmond Lot is used by JWU for the primary benefit of its employees and students "in direct support of, or in a manner related to the institution's educational purposes." 20 U.S.C. § 1092(f)(6)(A)(iii); see generally, Trustees of Tufts College v. Medford, 616 N.E.2d 433, 436 (Mass. 1993) (proposed parking garage was for an educational purpose because it was located in "core . . . area" of college campus); Martin v. Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, 747 N.E.2d 131, 149 (Mass. 2001) (citing Trustees of Tufts College for same proposition); Regents of University of New

---

[5]Consequently, in September 2004, approximately ninety-six percent of the available parking spaces in the Richmond Lot were used by JWU employees or students.

[6]Adjacent means "lying near, close, or contiguous; adjoining; neighboring. . . ." Random House Unabridged Dictionary 25 (2d ed. 1993).

[7]The record reflects that the Richmond Lot is owned both by JWU and Griffin Realty, a wholly owned subsidiary of JWU. Plaintiff argues that Griffin Realty is a separate and distinct corporation from JWU, and as such, should not be included in JWU's corporate umbrella when determining JWU's obligations under the Act. Plaintiff argues that the Court should not ignore the existence of Griffin Realty as a separate legal entity with a separate corporate purpose. The Act provides that in order to meet the requirements of the term "public property" the property, inter alia, must be "adjacent to a facility owned or controlled" by JWU. 20 U.S.C. § 1092(f)(6)(A)(iii) (emphasis added). JWU has provided an affidavit from Christopher Placco, the Vice President of Facilities Management for the Providence Campus of JWU, which not only provides that Griffin Realty is a wholly owned subsidiary of JWU but that JWU "controls the Richmond Lot . . . ." Placco Affidavit ¶ 8 (emphasis added). The affidavit submitted by the President of Metropark, Ltd., the third party manager of the Richmond Lot, states that "Metropark manages the Richmond Lot on behalf of [JWU]." Meyers Affidavit ¶ 2. Plaintiff has not submitted any evidence to create a genuine issue of fact with regard to whether or not JWU controls the Richmond Lot, consequently the Court need not consider the impact, if any, of Griffin's corporate status as a wholly owned subsidiary of JWU.

Mexico v. Hughes, 838 P.2d 458, 467 (N.M. 1992) ("any such adjacent land must be used for school purposes, which may include the parking of vehicles used by students in attending classes or otherwise participating in educational or instructional activities"). The Court concludes that the incident occurred in an area that meets the statutory definition of the term "public property" and thus meets the Acts requirement for the location of a reportable offense.

Plaintiff next argues that because the Crime Alert stated that the altercation was an assault JWU was not required by the Act to issue a timely report of the incident. JWU avers that it was required to issue the Crime Alert under the Act because Plaintiff committed an aggravated assault on Ratcliffe.

The Act requires JWU to issue timely reports for, inter alia, incidents of aggravated assault. 20 U.S.C. §§ 1092(f)(1)(F)(i)(IV) & (f)(3). The statute however, does not define the term "aggravated assault." Where a statute "is silent or ambiguous with respect to the specific issue the court must defer to the agency's permissible construction of the statute." Dunn v. United States Department of Agriculture, 921 F.2d 365, 367 (1st Cir. 1990) (internal quotation marks and citation omitted). "[I]nterpretations of an agency concerning statutes it administers are entitled to extreme deference." Phoenix-Griffin Group II, Ltd. v. Chao, 376 F. Supp. 2d 234, 239 (D.R.I. 2005). The regulations adopted by the United States Department of Education pursuant to the Act define "aggravated assault" as

> [a]n unlawful attack by one person upon another for the purpose of inflicting severe or aggravated bodily injury. This type of assault usually is accompanied by the use of a weapon or by means likely to produce death or great bodily harm. (It is not necessary that injury result from an aggravated assault when a gun, knife, or other weapon is used which could and probably would result in serious personal injury if the crime were successfully completed.)

34 C.F.R. § 668, Subpart D, Appendix A (emphasis added); see also 34 CFR §§ 668.46(c)(1);

(c)(7); & (e).

Although the incident was labeled by police as a simple assault, the police report also reflects the severity of Ratcliffe's injuries by noting the Ratcliffe was transported by rescue from the scene to Rhode Island Hospital. The incident report produced by the Campus Safety officer noted that, as a result of the incident, Ratcliffe was diagnosed with a "concussion and skull fracture" and that if he sustained a "another blow to the head in the area of the fracture, the resulting injury could be fatal." Defendant's Reply Memorandum at Ex. 3. The Crime Alert was titled "ASSAULT" but, like the police report and incident report, it also contained references to the severity of Ratcliffe's injuries by reporting that "one student was struck and fell to the ground. The student sustained a head injury when he fell to the ground." Defendant's Motion for Summary Judgment Ex. 8.

It is readily apparent that Ratcliffe, as a result of being punched by Plaintiff, suffered a "severe or aggravated bodily injury." See 34 C.F.R. § 668, Subpart D, Appendix A. The Court finds that Ratcliffe was a victim of an aggravated assault as defined by the Act. The Court therefore concludes that the incident was a reportable crime pursuant to the Act. Finding that both the nature of the altercation and its location meet the reporting requirements of the Act, the Court concludes that JWU had a legal duty to publish the Crime Alert.

Because the Court has concluded that JWU had a legal duty to publish the Crime Alert, it follows that JWU was covered by the qualified privilege. Plaintiff, however, attempts to overcome JWU's qualified privilege by arguing that the there is sufficient evidence in the record to show that JWU published the Crime Alert with ill will directed towards Plaintiff. "A privileged communication is, by definition, made in good faith." Mills, 837 A.2d at 720. In

order to overcome the qualified privilege, Plaintiff "must show that the primary motivating force for the communication was the publisher's ill will or spite toward him." Ponticelli, 247 A.2d at 308 (emphasis added).

> "Although it is true that, [w]hether ill will or spite is the incentive for a publication is . . . a fact question and is ordinarily for the fact-finder to decide . . . to overcome a motion for summary judgment based on a qualified privilege, a plaintiff must point to some specific facts in the record that raise a genuine issue relative to the existence of such ill will."

Kevorkian, 913 A.2d at 1049 (internal quotation marks, citation and footnote omitted).

Plaintiff argues that JWU's ill will in publishing the Crime Alert is evidenced by Martel's labeling him a liar and, by association, a "thug" during Plaintiff's meeting with Martel. The particular conversation to which Plaintiff refers occurred after the Crime Alert was published; consequently, any argument that it shows or supports an inference of ill will in publishing the Crime Alert is a non-starter. Even if it somehow could support an inference of ill will, there is no indication in the record that Martel was involved in the decision to publish the Crime Alert. Since Martel's comments occurred after the publication of the Crime Alert they could not have been the primary motivating force in the decision to publish the Crime Alert. See Ponticelli, 247 A.2d at 308.

Plaintiff also argues that ill will is shown by Bennett suggesting that the Crime Alert include Plaintiff's name and his fraternity membership. Plaintiff argues that JWU published other Crime Alerts involving JWU students that did not reveal the alleged assailant's name. First, with respect to the reference to Plaintiff's fraternity membership, Bennet stated in her deposition testimony that at the time she reviewed the draft Crime Alert she was aware of two other incidents in the prior year that involved members of fraternities threatening or assaulting

students. One of those prior incidents involved a member of the fraternity to which Plaintiff belonged. As a result, Bennet considered whether the incident involving Plaintiff, and by association his fraternity, "represented a continuing threat or a threat to the University community." Plaintiff's Opposition to Summary Judgment, Bennet Deposition at 7. Bennet's testimony on this point is not contradicted by any other evidence in the record. Thus, JWU's decision to include the name of the fraternity to which Plaintiff belonged in the Crime Alert was not primarily motivated by ill will. See Ponticelli, 247 A.2d at 308.

Plaintiff also argues that JWU's ill will is shown by the inclusion of his name in the Crime Alert. Martel stated in his deposition testimony that he was aware of approximately five Crime Alerts involving JWU students that did not identify the JWU students by name. In her deposition, Bennet clarified Martel's statement and explained that, for all of the instances that Martel identified except one, the identity of the alleged assailant as a JWU student was not known until after the Crime Alert was published.[8] Bennet did identify an instance in 2003 when a Crime Alert was published that included the name of a JWU student as an alleged assailant. Bennet stated that in discussing whether the Crime Alert should identify the Plaintiff by name she "decided that it made the most sense to identify [Plaintiff] by name because we knew who he was." Plaintiff's Opposition to Summary Judgment, Bennet Deposition at 4. Reviewing the facts in the light most favorable to Plaintiff, the Court can reach only one plausible conclusion as to why Plaintiff's name appeared in the Crime Alert: JWU knew it. Further, it is undisputed that the reason that previous Crime Alerts did not include the name of a JWU student as the assailant

---

[8]At the time of her deposition, Bennet had not yet had the opportunity to review the files relating to the one remaining Crime Alert.

was because it was not known that the assailant was a JWU student at the time of publication of the Crime Alert. This is reasonable considering JWU's duty to issue an alert in a timely manner in order to adequately warn students and employees of a potential safety threat. See 20 U.S.C. § 1092(f)(3).

> [I]t is axiomatic that a party opposing a motion for summary judgment will not be allowed to rely upon mere allegations or denials in [the] pleadings. Rather, by affidavit or otherwise [the opposing party has] an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact."

Kevorkian, 913 A.2d 1049 (internal quotation marks and citation omitted). Plaintiff has failed to set forth specific facts showing that there is a genuine issue of material fact concerning whether ill will was the primary motivating factor in JWU's publishing of the Crime Alert. If there was any ill will – and it is by no means clear that there was – it was "merely incidental rather than motivating." Swanson v. Speidel Corp., 293 A.2d 307, 311 (1972). Consequently, Plaintiff's attempt at overcoming JWU's qualified privilege fails. The Court finds that JWU is entitled to judgment as a matter of law with respect to the defamation claim.[9]

B. Breach of Contract

At oral argument on the motion for summary judgment, counsel for Plaintiff clarified for the Court that the breach of contract claim was limited to the manner in which JWU handled the appeal. Specifically, Plaintiff argues that JWU breached the duty of good faith and fair dealing when Martel spoke to Sarawgi and told her "all about the case" before she rendered her decision. Plaintiff's Opposition to Summary Judgment at 12. Plaintiff avers that his reasonable expectation was that the appellate officer assigned to his appeal would not be improperly

---

[9] As a result of the Court's decision, the Court need not address Plaintiff's punitive damages claim.

influenced by a conversation with "the Dean of students who had already prejudged [Plaintiff] as a liar, and by association, a 'thug.'" Id. at 13. Plaintiff cites Mangla v. Brown University, 135 F.3d 80 (1st Cir. 1998), in support of his argument. JWU avers that Plaintiff's allegations do not support a claim for breach of contract.

"The student-college relationship is essentially contractual in nature." Mangla, 135 F.3d at 83. The terms of the contract may include statements made in student handbooks or manuals. Id.; see also Gorman v. St. Raphael Academy, 853 A.2d 28 (R.I. 2004). The proper standard for interpreting contractual terms between a university and a student is that of "reasonable expectation – what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." Mangla, 135 F.3d at 83 (internal quotation marks and citation omitted). Courts must construe contracts for private education "in a manner that leaves the [university] administration broad discretion to meet its educational . . . responsibilities." Gorman, 853 A.2d at 34. "Private schools must have considerable latitude to formulate and enforce their own rules to accomplish their academic and educational objectives." Id. at 39.

"Under Rhode Island law, contracts contain an implied duty of good faith and fair dealing." Mangla, 135 F.3d at 84.[10] In determining whether a party has breached the implied covenant of good faith and fair dealing the Court must decide "whether or not the actions in question are free from arbitrary or unreasonable conduct." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d 317, 329 (D.R.I. 1999), aff'd, 217 F.3d 8 (1st Cir. 2000). "The

[10]Because neither party contends otherwise, the Court assumes without deciding that the duty of good faith and fair dealing applies to the student-private university relationship. See generally Mangla, 135 F.3d 80 (assuming for sake of argument that the duty of good faith and fair dealing applied to a university admission's decision).

implication of the duty is that the parties will act in a manner consistent with the purposes of the contract." LifeSpan Physicians Professional Services Org., Inc. v. Combined Insurance Co. of America, 345 F. Supp. 2d 214, 225 (D.R.I. 2004).

The JWU student handbook provides that, in order to request an appeal, a student must submit his request "in writing, by hand delivery or certified mail, to the appeal officer designated in the Conduct Review Notification and Record." Defendant Motion for Summary Judgment Ex. 13 at 22. In this case the Student Conduct Office's notification of its decision clearly identified Sarawgi as the appeal officer and noted that the "appeal officer must receive [the] appeal letter" by September 26. Id. at Ex. 9. For reasons unclear to the Court, Plaintiff sent his appeal letter to Martel instead of Sarawgi. Martel, however, forwarded the notice of appeal to Sarawgi and the Student Affairs Office received it on September 27. Sarawgi subsequently reviewed Plaintiff's appeal and issued her decision on September 29, 2004.

With respect to his conversation with Sarawgi, Martel testified in his deposition that Sarawgi "wanted specifics of the case, what transpired which I indicated to her in the folder, the Incident Reports were pretty clear, the decision of the panel was pretty straight forward, and did she [sic] see any reason why this individual should not be dismissed from the University; and I indicated no, I did not." Plaintiff's Opposition to Summary Judgment, Martel Deposition at 47-48. Martel stated that the "folder" Sarawgi would have received included the incident report, the hearing notification, the hearing procedure and the final decision by the hearing officers.

Although Plaintiff argues that Martel interfered with the appeal process, Martel's "involvement" in the process, if any, was not significant and was precipitated by Plaintiff's own actions, i.e., Plaintiff initiated the meeting with Martel and mistakenly sent his notice of appeal to

Martel. Plaintiff argues that it was improper for Sarawgi to speak to Martel, particularly after Martel had labeled Plaintiff a liar and a thug. The record, however, does not reflect that Martel made these comments to Sarawgi nor does the record reflect that Sarawgi had any knowledge of Martel's particular characterizations of Plaintiff when she made her decision. Plaintiff has presented no more than a conclusory allegation to support his claim that Sarawgi was somehow improperly influenced or predisposed to rule against him as a result of Martel's characterizations of Plaintiff. "Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." Thomas v. Metropolitan Life Insurance Co., 40 F.3d 505, 508 (1st Cir. 1994). The Court need not "credit purely conclusory allegations, indulge in rank speculation, or draw improbable inferences." National Amusements, 43 F.3d at 735.

In essence, the conversation between Martel and Sarawgi, consisted of Martel responding "no" when asked by Sarawgi if he saw any reason why Plaintiff's dismissal was not justified. Based upon these particular circumstances, the extent of Martel's "involvement" in the appeals process was neither arbitrary nor unreasonable. See Ross-Simons, 66 F. Supp. 2d at 329. The Court concludes that the limited conversation between Sarawgi, the appeal officer, and Martel, a Dean of the university, does not rise to the level of a breach of the duty of good faith and fair dealing as it relates to the Plaintiff's appellate rights.

Moreover, the student handbook provides that

> [t]o request an appeal, you must submit a request in writing, by hand delivery or certified mail, to the appeal officer designated in the Conduct Review Notification and Record. *The request must be submitted within two business days from the date of the decision and must state clearly the basis for your appeal. Your appeal will be reviewed upon receipt,* and a decision concerning your appeal will be available within a reasonable time. *The decision of the appeal officer will be final.*

Defendant Motion for Summary Judgment Ex. 13 at 22 (emphasis in original). The handbook does not place any specific limitation on the scope of Sarawgi's review. The handbook provides that the "appeal will be reviewed upon receipt" and that the a decision "will be available within a reasonable time." These general provisions do not limit JWU's "broad discretion" in implementing its internal appeals process in any significant manner. See generally Gorman, 853 A.2d 34; see also Schaer v. Brandeis University, 735 N.E.2d 373, 381 (Mass. 2000) (courts are "charry about interfering with academic and disciplinary decisions made by private colleges and universities") (internal quotation marks and citation omitted). The Student Affairs Office received Plaintiff's appeal on September 27, 2004, and Sarawgi rendered her decision on September 29, 2004. The Court concludes that Plaintiff received the process he was entitled to under the relevant provisions of the student handbook. Accordingly, the Court finds no breach and JWU's motion for summary judgment with respect to the breach of contract claim is granted.

## IV. Conclusion

For the foregoing reasons, JWU's motion for summary judgment is GRANTED.

SO ORDERED.

Mary M. Lisi

Mary M. Lisi
Chief United States District Judge
May 11, 2007